**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2023

Argued: March 20, 2024
Decided: May 23, 2025

No. 23-828

———————————————————————

JANA ROMANOVA,
*Plaintiff-Appellant,*

*v.*

AMILUS INC.,
*Defendant-Appellee.*

———————————————————————

Before:     JACOBS, LEVAL, and SULLIVAN, *Circuit Judges*.

Plaintiff Jana Romanova appeals from the judgment of the United States District Court for the Southern District of New York (Caproni, *J.*) dismissing Romanova's claim of willful copyright infringement against Defendant Amilus Inc. pursuant to Section 501 of the Copyright Act. Her complaint alleged that Defendant infringed upon her rights when it published a photograph authored by her on its website without her authorization. Defendant made no answer to the complaint and did not appear in the district court. On Plaintiff's motion for default judgment, the district court ordered Defendant to show cause why the court should not grant the motion. Having received no response from Defendant, the court then *sua sponte* ordered Plaintiff to show cause why Defendant's use of Plaintiff's photograph did not constitute fair use. After considering Plaintiff's

response, the district court dismissed Plaintiff's complaint with prejudice on the ground that Defendant's publication of Plaintiff's photograph constituted fair use. The district court's judgment is REVERSED, and the case is REMANDED with instructions to enter a default judgment in Plaintiff's favor.

JUDGE SULLIVAN concurs in a separate opinion.

> RENEE J. ARAGONA (Craig B. Sanders, *on the brief*), Sanders Law Group, Garden City, NY, *for Plaintiff-Appellant*.

LEVAL, *Circuit Judge*:

Plaintiff Jana Romanova, a professional photographer, appeals from the judgment of the United States District Court for the Southern District of New York (Caproni, *J.*) dismissing Romanova's claim of willful copyright infringement against Defendant Amilus Inc. pursuant to Section 501 of the Copyright Act, 17 U.S.C. § 501. The complaint alleged that Amilus infringed her copyright by displaying a copyright-protected photograph authored by her on its website without her authorization. Amilus neither answered the complaint nor appeared in the district court. Nor has Amilus appeared in this appeal.

While Romanova's motion for default judgment was pending, the district court, *sua sponte*, ordered her to show cause why her complaint should not be dismissed on the ground that Defendant's republication of her photograph was a fair use. Upon consideration of Romanova's response, the district court

2

dismissed the complaint with prejudice, concluding that the fair use defense was "clearly established on the face of the complaint." App'x at 76.

Plaintiff's appeal is on two grounds, one substantive and one procedural. She argues (1) that the court erred in finding a basis in her complaint for the fair use defense; and (2) that the court erred in *sua sponte* raising a "substantive, non-jurisdictional affirmative defense on the part of a non-appearing defendant," Appellant's Br. at 3. We agree with Plaintiff's substantive argument and therefore have no need to consider her procedural argument. We REVERSE the judgment and REMAND with instructions to enter default judgment in favor of Plaintiff.

## BACKGROUND

### I. Facts

We draw the following facts from the allegations of Plaintiff's complaint and the documents that it incorporates. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). Romanova is a professional photographer and Russian citizen, who relies on licensing fees from online and print publications of her photographs as her primary source of income. Romanova authored a

3

photograph of a Russian woman with two snakes (the "Photograph" or the "Work"). In the Photograph, one sees a woman in a domestic environment with one snake wrapped around her left hand, while another snake crawls up her torso.

Plaintiff licensed National Geographic Magazine to publish the Photograph, for a single use, in an article entitled "Intimate Photos of People and Their Beloved Pet Snakes." App'x at 57. It was published on September 29, 2017. On October 3, 2017, Plaintiff registered the Work with the United States Copyright Office.

Defendant Amilus Inc. is the registered owner of the website identified as "www.ai-ap.com" (the "Website"). On December 31, 2017, Defendant copied Plaintiff's Work from the National Geographic publication in an article on the Amilus Website entitled "Trending: Dogs, Cats . . . and Other Pets, to Start Off 2018." App'x at 64, 67 (ellipsis in original). To view the Amilus Website and the article exhibiting Plaintiff's Photograph, one must subscribe to Amilus and pay a

monthly membership fee of about $5. The Website also sells merchandise to the public. App'x at 9, 74.

Defendant's online article showed ten photographs of people with pets, each apparently copied from other publications. The article declared that it was published in "continu[ation of the website's] semi-regular series focusing on the ever-increasing amount of pet photography we find online." App'x at 64. It added, "We also have some pet snakes thrown in for good measure." App'x at 65. The Website's caption to Plaintiff's Photograph states, "Intimate Photos of People and Their Beloved Pet Snakes." App'x at 71. Plaintiff's Photograph is the only one in Defendant's article showing snakes.

Plaintiff observed her Photograph on Defendant's Website on December 26, 2019, approximately two years after the Photograph's initial publication on the Website. Twice, Plaintiff sent notifications to Defendant demanding that it take down her Photograph from its Website and cease and desist from further unauthorized use. Defendant did not respond or comply.

## II.  The Proceedings Below

On October 20, 2022, Plaintiff initiated this suit.[1] She served Defendant

with a copy of the summons and complaint. Defendant did not appear. A

Certificate of Default was entered against Defendant, and Plaintiff moved for

default judgment.

The district court ordered Defendant to show cause why the court should

not enter a default judgment against Defendant. Plaintiff's counsel informed the

court via letter of having spoken with a corporate officer of Defendant, who

confirmed receipt of the Clerk's Certificate of Default and the Order to Show

Cause and advised that Defendant would not participate in the proceedings.

The district court then held a hearing on Plaintiff's motion for default

judgment. Rather than grant default judgment, the district court *sua sponte*

---

[1] Civil actions for copyright infringement must be commenced "within three years after the claim accrued." 17 U.S.C. § 507(b). Within this circuit, the period for bringing suit begins when the plaintiff discovers the infringement (or when it should have, with due diligence, discovered such infringement). *See Sohm v. Scholastic, Inc.*, 959 F.3d 39, 50 (2d Cir. 2020) (citing *Psihoyos v. John Wiley & Sons*, 748 F.3d 120, 124 (2d Cir. 2014)). Plaintiff filed suit within three years of discovering Defendant's publication. We know no reason to believe that Plaintiff should have discovered the publication earlier. We are aware of no reason that would cause us to doubt that Plaintiff's suit was timely.

ordered Plaintiff to show cause why the court should not dismiss the case on the grounds that Defendant's use of Plaintiff's Photograph constituted fair use. As directed, Plaintiff filed a Memorandum and Declaration.

The district court then dismissed Plaintiff's complaint with prejudice, concluding that Plaintiff had failed to state a claim upon which relief could be granted, explaining that the fair use defense was "clearly established on the face of the complaint." App'x at 76.

**STANDARD OF REVIEW**

We "review *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers*, 282 F.3d at 152.[2] To state a claim, "a complaint must allege sufficient facts . . . to state a plausible claim for relief." *Johnson v.*

---

[2] Given the district court's articulation of the relevant standard of review, we understand its dismissal to have been based on Federal Rule of Civil Procedure 12(b)(6), and thus apply its standard here. *See* App'x at 76–77 (setting forth the standard applicable to Rule 12(b)(6) motions and concluding that, if the fair use defense applies, Romanova "has failed to state a claim").

*Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013). A court need not, however, "accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

## DISCUSSION

### I.     The Copyright Act

We begin by discussing the Copyright Act and the law of fair use. "The ultimate goal of copyright is to expand public knowledge and understanding, which copyright seeks to achieve by giving potential creators exclusive control over copying of their works, thus giving them a financial incentive to create informative, intellectually enriching works for public consumption." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 212 (2d Cir. 2015) [hereinafter "*Google Books*"]. In so doing, the Copyright Act balances "competing claims upon the public interest"—principally, the creation of art with its availability to the public. *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 156 (1975).

On the one hand, "[t]he Copyright Act encourages creativity by granting to the author of an original work 'a bundle of exclusive rights,'" which "includes the rights to reproduce the copyrighted work, to prepare derivative works, and,

8

in the case of pictorial or graphic works, to display the copyrighted work publicly." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 526 (2023) [hereinafter "*Warhol*"] (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 546 (1985)) (citing 17 U. S. C. § 106). These exclusive rights give artists financial incentives for artists to create, and their creations inure to the benefit of the public. A copyright holder can protect her bundle of exclusive rights by bringing suit for an injunction and damages against unauthorized users of her work. *See* 17 U.S.C. §§ 502, 504.

On the other hand, the copyright law "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Warhol*, 598 U.S. at 527 (citation omitted). In 1976, Congress enacted § 107 of the Copyright Act, giving statutory recognition to the long existing common law doctrine of fair use. *Id.*; *see also Google Books*, 804 F.3d at 212 (summarizing the history of the common law doctrine of fair use).

Section 107 provides:

[T]he fair use of a copyrighted work, . . . , for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;
(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

17 U.S.C. § 107. Points one through four are known as the four fair use factors.

The Supreme Court has clarified that fair use is an affirmative defense to a claim of copyright infringement, the proponent of which bears the burden of justifying its taking. *See Warhol*, 598 U.S. at 547 n.21 ("[F]air use is an affirmative defense, and [the proponent] bears the burden to justify its taking. . . ."); *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994); *see also Google Books*, 804 F.3d at 213; *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 107 (2d Cir. 1998) ("Since fair

10

use is an affirmative defense to a claim of infringement, the burden of proof is on its proponent.").

Notwithstanding that the Defendant, having defaulted, did not raise the defense of fair use, the district court nonetheless considered the defense on the Defendant's behalf and concluded that the applicability of the fair use doctrine was evident on the face of the complaint. App'x at 76, 86. The district court found that Defendant's publication of Plaintiff's Photograph communicated a message that differed from what was originally intended by Plaintiff's image. According to the district court, the message of Plaintiff's Photograph, as published in National Geographic, was "to showcase persons in [Plaintiff's] home country of Russia that kept snakes as pets, specifically to capture pet snakes in common environments that are more associated with mainstream domesticated animals." App'x at 53, ¶ 14; *see id.* at 79. In contrast, the different message found by the district court to have been communicated by Defendant's publication of Plaintiff's image was "the ever-increasing amount of pet photography circulating online." *Id.* at 79 (internal quotation marks omitted). The fact that Defendant's

11

publication of Plaintiff's image in the district court's view communicated a message different from the message conveyed by Plaintiff led the district court to conclude that Defendant's unauthorized publication of Plaintiff's Work was a fair use and not an infringement.

We believe that the district court's analysis depended on a misunderstanding of the fair use doctrine and of how the facts of the case relate to the doctrine. We see no basis in the facts alleged in the complaint for a finding of fair use. We explain below why this is so.

## II.     Fair Use

Section 107 identifies the concern of Factor One as "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). In *Campbell v. Acuff-Rose Music, Inc.*, the Supreme Court explained what purposes of copying would favor a finding of fair use under the first factor. 510 U.S. 569 (1994). The Court focused on two considerations.

The Court identified the first inquiry as whether the copy "supplant[s]" the original — whether, in the terms used by Justice Story in *Folsom v. Marsh*, 9 F.

12

Cas. 342, 348 (C.C.D. Mass. 1841) (No. 4,901), it merely "supersede[s] the objects" of the original – "or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is 'transformative.'" *Campbell*, 510 U.S. at 579 (alteration in original) (internal citations omitted). Transformative uses are favored over those that risk to serve as substitutes for the original. *Id.*

The most paradigmatically recognized transformative uses are rarely the subject of litigation, so that there are few precedential cases discussing them. These include parodies, which quote extensively from the subject of the parody for the purpose of ridiculing it; limited quotation from books in a book review for the purpose of showing potential readers a glimpse of the subject's writing style; and biographical works that quote from the speeches, published writings, and unpublished papers of noted public figures for the purpose of revealing their attitudes, thoughts, and biases. *See, e.g.*, *New Era Publications Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1523 (S.D.N.Y. 1988) [hereinafter "*Holt*"]

13

(finding fair use where heirs of a famous public figure sued to suppress a biography which quoted from the subject's unpublished diary entries and letters to show his biases, his dishonesty, and his cruelty), *aff'd*, 873 F.2d 576 (2d Cir. 1989).[3] Perhaps in part because of the clarity of what will be the result of litigation of such claims, and perhaps also because authors benefit from the publication of book reviews about their books, authors do not often sue to suppress such uses.

Second, the *Campbell* Court stressed the importance to the fair use question of a "justification" for the copying of the original, which might depend on the nature of the message communicated through the secondary user's copying of the original. The Court illustrated the point by distinguishing parody, which the *Campbell* defendant claimed to have employed, from satire:

---

[3] In *New Era*, the district court had dismissed the case, finding fair use. The court of appeals affirmed the judgment for other reasons, nonetheless noting that the district court's finding of fair use of previously unpublished work was precluded by *Salinger v. Random House, Inc.*, 811 F.2d 90, 97 (2d Cir.), *opinion supplemented on denial of reh'g*, 818 F.2d 252 (2d Cir. 1987) (per curiam). *New Era Publications Int'l, ApS v. Henry Holt & Co.*, 873 F.2d 576, 581 (2d Cir. 1989). Congress, however, soon thereafter amended § 107 to reject the *Salinger* precedent by adding a sentence to the statute providing, "The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration on all the [§ 107] factors." 17 U.S.C. § 107.

[P]arody has an obvious claim to transformative value. . . . Like less ostensibly humorous forms of criticism, *it can provide social benefit, by shedding light on an earlier work,* and, in the process, creating a new one. We thus line up with the courts that have held that parody, like other comment or criticism, may claim fair use under § 107. . . . For the purposes of copyright law, the nub of the definitions, and *the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one that, at least in part, comments on that author's works. If, on the contrary, the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish).* . . . Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination, whereas satire can stand on its own two feet and so requires justification for the very act of borrowing.

*Campbell*, 510 U.S. at 579–81 (emphasis added) (internal citations omitted).

This passage underscored the importance for a fair use finding of whether the copying work served as a criticism or commentary on the original work or its author as justification for the taking. Probably because *Campbell* had expressed the point in terms of parodies, and the *Campbell* defendant claimed that its copying use was a parody, courts at first assumed that this passage applied only to parodies, and paid little attention to it.

In *Google Books*, we quoted the passage from *Campbell* discussing the need for justification. We commented,

> In other words, the would-be fair user of another's work must have justification for the taking. A secondary author is not necessarily at liberty to make wholesale takings of the original author's expression merely because of how well the original author's expression would convey the secondary author's different message. Among the best recognized justifications for copying from another's work is to provide comment on it or criticism of it. A taking from another author's work for the purpose of making points that have no bearing on the original may well be fair use, but the taker would need to show a justification.

*Google Books*, 804 F.3d at 215; *see* Shyamkrishna Balganesh & Peter S. Menell, *Going "Beyond" Mere Transformation:* Warhol *and Reconciliation of the Derivative Work Right and Fair Use*, 47 COLUM. J. L. & ARTS 413, 436 (2024) ("The key to operationalizing the first fair use factor . . . lies in examining the *justification* offered by the copier for the use.").

In any event, the Supreme Court's ruling in *Warhol* made clear that *Campbell*'s requirement of justification is not applicable only in cases of claimed parody, but applies generally to all claims of fair use.

In *Warhol*, Vanity Fair magazine secured a license in 1984 from photographer Lynn Goldsmith to make a single use of Goldsmith's photographic portrait of the recently famous singer Prince as a reference for the creation of a cover portrait of Prince. 598 U.S. at 515, 517. Vanity Fair hired the famous artist Andy Warhol to make its cover portrait utilizing the Goldsmith photograph. *Id.* at 515. (In order to avoid confusion between Andy Warhol the artist and the Andy Warhol Foundation, we refer to the artist as "Warhol" and to the Andy Warhol Foundation as "the Foundation.") Warhol made sixteen images based on the Goldsmith photograph from which he selected one, a purple silkscreen portrait that we refer to as "Purple Prince," for use as the magazine cover. *Id.* at 515, 518. Thirty-two years later, years after the death of Warhol, when Prince died (now immensely famous), Vanity Fair decided to devote an issue to him. *Id.* at 519–20. Its parent, Condé Nast, asked the Foundation, heir to Warhol's copyright covering Purple Prince, for a license to use Purple Prince again as the cover to the newly planned Prince issue. *Id.* at 519. Upon discovering that Warhol had made fifteen additional trial portraits of Prince based on the Goldsmith

photograph for the initial commission, Vanity Fair chose a different image, "Orange Prince," so named because all the white surfaces were stained orange. *Id.* Condé Nast paid the Foundation $10,000 for the license. *Id.* at 520. (The record does not reveal why Condé Nast did not also seek a license from Goldsmith. We would guess that this was a simple oversight, rather than a conscious effort to evade Goldsmith's copyright.)

When Goldsmith saw the Vanity Fair cover utilizing her photograph without her authorization, she sent a protest to the Foundation. *Id.* at 522. Instead of prevailing on Condé Nast to settle with Goldsmith, the Foundation sued Goldsmith, seeking a declaratory judgment that Warhol's use of the Goldsmith photograph was a fair use and therefore not an infringement. *Id.*

The district court decided in favor of the Foundation, finding fair use. *Id.* (citing *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 382 F. Supp. 3d 312, 316 (S.D.N.Y. 2019)). On appeal, we reversed, ruling that it was not a fair use. *Id.* at 523 (citing *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 54 (2021)). The Supreme Court granted certiorari.

A seven to two majority of the Court decided in favor of Goldsmith. *Id.* at 551. Justice Kagan, joined by the Chief Justice, wrote a spirited dissent, asserting that Warhol's treatment was a fair use. *See id.* at 558–93 (Kagan, J., dissenting). The majority's rejection of the dissent's arguments does much to clarify the governing fair use standards, as they bear on the case now before us.

The majority concluded that the Foundation's use of the original was not transformative. *Warhol*, 598 U.S. at 526 (majority opinion). It was undisputed that the Orange Prince portrait, in utilizing the Goldsmith photo of Prince, did not comment on, or implicitly critique, Goldsmith or her photograph. *Id.* at 540.[4] Warhol simply used the Goldsmith photo-portrait as a raw material from which he produced his Prince portraits, making various alterations to the original. The changes he made to Orange Prince consisted primarily of printing the Goldsmith image of Prince in high contrast, erasing the middle greys; eliminating the neck, shoulders and torso, leaving the head alone; straightening the head to eliminate a

---

[4] The Foundation argued that Warhol's Prince portraits were a comment on celebrity, but not that they commented on Goldsmith or her photograph. *See Warhol*, 598 U.S. at 540.

slight tilt in the original; and staining the image a vivid orange. *Id.* at 517 n.1; *id.* at 562, 564–65 (Kagan, J., dissenting).

The dissenting opinion deemed those changes to be of great importance. In the dissent's view, the elimination of middle greys converted Goldsmith's image of an insecure, frail, and vulnerable human being into an invulnerable icon, a product of the celebrity machine; the elimination of the neck and torso, together with the straightening of the head, and the orange coloration, further served that change of image, presenting Prince's disembodied head as if larger than life. *Id.* at 566, 573–74. The dissent considered these changes to be powerfully transformative, completely changing the nature of the being depicted. *Id.* at 565. As for the fact that the Warhol image did not critique or comment on the Goldsmith work—which, under the standards of *Campbell*, would have challenged the copier to show another justification for the copying—the dissent concluded that the Supreme Court had implicitly disavowed and abandoned that part of the *Campbell* standards in *Google LLC v. Oracle America, Inc.*, 593 U.S. 1 (2021) [hereinafter "*Google*"], in which the Court found fair use in a copying that

that did not comment on the original. *Warhol*, 598 U.S. at 580–81 (dissenting

opinion).

The Supreme Court majority firmly rejected all of the dissent's arguments.[5]

 The majority acknowledged that Warhol made changes but found little

significance in them for purposes of deciding whether the use was

transformative. *See id.* at 545 (majority opinion) ("The purpose . . . is, still, to

illustrate a magazine about Prince with a portrait of Prince."). Further

undermining any claim of justification for copying, the majority stressed that the

purpose of the Foundation's use of Warhol's Prince portrait, like Goldsmith's

photograph, was licensing for use by a magazine. *Id.* at 545. Using Justice Story's

terminology, the effect of the Foundation's license was to "supersede" the

---

[5] Although the Foundation's complaint instituting the suit sought a declaratory judgment that, in creating the Prince Series of sixteen works, Warhol had made fair use of Goldsmith's portrait, the Supreme Court majority made clear that the use it was ruling on was the Foundation's licensing of Orange Prince and that it "expresse[d] no opinion as to [Warhol's] creation . . . of any of the original Prince Series works." *Warhol*, 598 U.S. at 534. Nonetheless, the dissenting opinion argued vigorously that Warhol's version was highly transformative and constituted fair use of Goldsmith's portrait. *See supra* pp. 20–21. In expressing disagreement with the dissent's view, the majority also unavoidably expressed views on aspects of the question whether Warhol had made fair use. *See, e.g.*, *Warhol*, 598 U.S. at 545–46. Those issues were inevitably pertinent to whether the Foundation's grant of a license was a fair use.

original from which it was copied. *Id.* at 536. The majority also emphatically

rejected the dissent's suggestion that the finding of fair use in the *Google* case

represented a disavowal of the *Campbell* Court's insistence on the importance of

commentary on the original as furnishing justification for copying it.[6] *Id.* at 547

---

[6] We find not the slightest suggestion in the text of the majority opinion in *Google*, finding a fair use that did not comment on the copied original, that the majority was jettisoning *Campbell*'s stress on the importance of commentary as a justification for copying. The implication of the *Google* opinion is clearly to the contrary. Rather than dispensing with the importance of justification under Factor One, the *Google* Court arrived at its finding through application of the same fair use elements, while emphasizing the fact that the declaring code that was copied was different from most copyrightable works. The Court explained that computer programs, as "process[es]," would have been ineligible for copyright protection under 17 U.S.C. § 102(b), had Congress not added software to the Copyright Act's definition of "literary works." *Google*, 593 U.S. at 19–21, 23. The opinion quoted First Circuit Judge Michael Boudin's observation that "applying copyright law to computer programs is like assembling a jigsaw puzzle whose pieces do not quite fit." *Id.* at 21 (quoting *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 820 (1st Cir. 1995) (Boudin, J., concurring)). The Court accordingly took the rare step of finding dominant importance in Factor Two, "the nature of the copyrighted work," favoring a finding of fair use simply because the dispute involved the copying of declaring code, which the Court deemed to be far "from the core of copyright." *Id.* at 29. The opinion explained that, if fair use were inapplicable to the copying of declaring code (which would be the likely result unless the copying use made a commentary on the original code), enforcement of the copyright monopoly "would risk harm to the public." *Id.* at 39. In this context, enforcement of a copyright of declaring code "would interfere with, not further, copyright's basic creativity objectives." *Id.*

The opinion concluded,

We do not overturn or modify our earlier cases involving fair use—cases, for example, that involve 'knockoff' products, journalistic writings, and parodies. Rather, we here recognize that application of a copyright doctrine such as fair use has long proved a cooperative effort of Legislatures and courts, and that Congress, in our view, intended that it so continue. As such, we have looked to the principles set forth in the fair use

---

22

n.21. The *Warhol* majority explicitly reaffirmed what the Court had said in

*Campbell* concerning the importance of commentary as justification for copying,

this time making clear that those observations had broad applicability and were

not limited to claims of parody. *Id.* at 542; *see also id.* at 547 (emphasizing that the

Foundation "offers no independent justification, let alone a compelling one, for

copying the photograph, other than to convey a new meaning or message,"

which, under the standards of *Campbell*, fails to justify copying).

We do not suggest that critique or commentary on the original (or its

author) are the only uses that will furnish a justification ultimately qualifying as

fair use.[7] Courts have found other justifications — mostly in circumstances

where the copying provided information to the public about the copied work, or

enabled the furnishing of valuable information on any subject of public interest,

---

statute, § 107, and set forth in our earlier cases, and applied them to this different kind of copyrighted work.

*Id.* at 40. There is no suggestion whatsoever that the Court was abandoning the standards it had laid down in *Campbell*. *See Warhol*, 598 U.S. at 533 n.8 (describing the consideration of justification in *Google*).

[7] *See* Pamela Samuelson, *Justifications for Fair Uses*, WIS. L. REV. (forthcoming 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5118267.

or rendered a valuable service to the public, in most cases limited to circumstances in which the benefit was provided without allowing public access to the copy, thus assuring that the copied work not serve as a substitute for the original in the marketplace.

Examples of rulings in which the justification for copying lay in providing the public with information about the works or their authors include:

- In *Google Books*, 804 F.3d at 214–18, and *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 97 (2d Cir. 2014) [hereinafter "*HathiTrust*"], we found justification for the copying of millions of copyrighted books into a computerized database that would enable potential readers to identify books that used terms of interest to them (without allowing them to read any substantial passages of the books).

- In *Google Books*, in addition, we found justification for publishing fragmentary snippets from the books to help potential readers determine, in addition to whether a book used a term of interest,

whether it also used the term in a context suggesting that the book was likely to be of interest to the reader (again without allowing access to more than the fragmentary snippets). 804 F.3d at 217–18.

- In *Holt*, as discussed above, the district court found fair use where heirs of a famous public figure sued to suppress a biography which quoted from the subject's unpublished diary entries and letters to show his biases, his dishonesty, and his cruelty. 695 F. Supp. at 1523.

- In a child custody litigation, an unpublished autobiography written by a father was introduced into evidence by the mother to show through the husband's admissions in the text of his book that he had murdered his father and therefore should be deemed an unfit parent. *Bond v. Blum*, 317 F.3d 385, 397 (4th Cir. 2003), *abrogated in part on other grounds by Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197 (2016) (abrogating the district court's ruling on attorney's fees without addressing ruling on fair use).

Precedents finding justification for copying where the copying work

provided a service relating to the copyrighted work include:

- In *Sony Corporation of America v. Universal City Studios, Inc.*, 464 U.S.

  417, 442–56 (1984), the Supreme Court found justification and fair

  use in the utilization of new technology that allowed copying of

  televised transmissions when used noncommercially by a person

  who had purchased entitlement to watch the transmission at the

  time of its transmittal to privately watch it (once only) at a more

  convenient later time.

- In *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 822 (9th Cir. 2003), and

  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir. 2007),

  the Ninth Circuit found fair use in an internet search engine's

  copying of images visible on the internet into tiny "thumbnails" to

  serve as links permitting a user to go to a site where information

  about the original was available (in circumstances where the tiny

  size and low resolution of the thumbnails made them unsuitable for

26

use for decorative purposes as substitutes for the originals that they copied).

- In *HathiTrust*, 755 F.3d at 101–03, we further found justification for the conversion of copyrighted works into formats readable by the blind (where substitution was unlikely to occur because the relevant market was sufficiently small that rights holders were unlikely to undertake to exploit the copyright in this manner for profit).

- In *American Geophysical Union v. Texaco Inc.*, the district court and our court each expressed support for the proposition that it might be a fair use to copy a scientific writing onto a durable material to better hold up than paper in the inhospitable conditions of a laboratory. *See* 802 F. Supp. 1, 14 (S.D.N.Y. 1992), *aff'd*, 60 F.3d 913, 923 (2d Cir. 1994).

Rulings in which the justification for copying lay in the furnishing of valuable information on a subject of public interest or a service important to the public have included:

- In *Google Books*, a further function enabled by the copying of millions of books into Google's database – the "ngrams" feature – was the furnishing of historical charts that provided comparisons of English language usage from decade to decade (again without allowing the reading of any of the copied works). 804 F.3d at 217, 230.

- In *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 82, 86 (2d Cir. 2014), the dissemination by a financial reporting service of a private copyright-protected conference call between a company's management and selected brokers about the company's recent performance served to make information critical to securities markets available to investors and analysts (where the value of the copied recording lay not in its copyright-protected manner of expression but in the unprotected information it supplied).

- In *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 22 (1st Cir. 2000), the First Circuit found justification and fair use in the copying in a local newspaper of a copyright-protected photograph of the winner

of a beauty contest, which photograph had been deemed

scandalous, causing the subject to lose her title. The justification was

that the copying enabled the public to form an opinion whether the

photograph merited the punishment inflicted on its account (where

the low quality of the reproduction in newsprint made it unsuitable

to serve as a decorative photograph in substitution for the original).

*Id.* at 22, 25.

- In *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 645 (4th Cir.

  2009), the Fourth Circuit found fair use in the copying of student

  theses into a database where the purpose of the copying was to help

  academic institutions detect whether student theses were

  plagiarized (without allowing the public to read the copied texts).

- In *Time Inc. v. Bernard Geis Associates*, 293 F. Supp. 130, 131–32, 138

  (S.D.N.Y. 1968), the owner of the copyright in the famous Zapruder

  film showing the fatal shooting of President John F. Kennedy sued

  the publishers of a book about the assassination in which charcoal

sketches copied from the frames of the Zapruder film were

published to illustrate the book's theory of the assassination. The

court found for the defendants, concluding that this was a fair use.

*Id.* at 146. The decision appeared to rest on two principal factors: (i)

the "public interest in having the fullest information available on the

murder of President Kennedy;"[8] and (ii) that, notwithstanding

public disclosure of the copies made by the defendants, there

"seem[ed to be] little, if any, injury to plaintiff, the copyright

owner." *Id.* [9]

---

[8] The defendants did not raise, and the court did not discuss a possible argument on the defendants' behalf that what was copied in the sketches was not the protected manner of expression of the film but the unprotected factual information conveyed by the photographic images – about the trajectory of the bullets, etc. – potentially defeating the copyright claim without reference to fair use.

[9] The rulings in the cited cases that the circumstances furnished justification for the copying were, as described above, often a product of a complex mixture of assessment of the value of the information or service conveyed to the public by the copying, with the fact that the particular use would not enable the copy to serve as a substitute for the protected expression of the original. In *Google Books,* for example, we expressly noted that, notwithstanding the enormous value of the information supplied to potential readers about the books copied into Google's database, the judgment would likely have come out the other way if the copying had enabled the public to read substantial parts of the copied books. *See Google Books*, 804 F.3d at 223–25. Prior to the *Warhol* opinion, the latter consideration had been widely regarded as the exclusive concern of the fourth

fair use factor, "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In *Warhol*, however, where only the first factor was under the Court's consideration, the fact that Warhol's copy was designed to compete in the same market as Goldsmith's original (the market for use on magazine covers), defeated the proposition that the Foundation's sale of the copying image favored fair use under the first factor. *See* 598 U.S. at 535–36, 536 n.12. Since *Warhol*, it appears that the first factor test, to the extent it questions the "justification" for the copying, looks not only at the value of the information or service rendered by the copying, but also at the likelihood that the copy can serve as a substitute for the original. This seems altogether appropriate, as the question whether an act of copying can be justified as a fair use cannot be satisfactorily answered without considering not only the service that the copying renders but also the likelihood that the copy will supersede or supplant the original, serving as a market substitute for the protected expression of the original. The four statutory fair use factors should not be viewed as discrete questions, isolated from one another, but as interrelated issues contributing to a holistic inquiry.

Inaccessibility of the copy to the public to diminish the likelihood that the copy could substitute for the original could lose its customary importance in at least two circumstances. One is where the copyright holder's interest is not to exploit the value of the copyright through public dissemination, but to suppress the revelation of matters of public importance that are displeasing to the rights holder. At times, suits alleging infringement are brought not to protect the rightsholder's opportunity to profit monetarily from the exploitation of the copyright, but rather to ensure concealment from the public of what is revealed by the copyrighted work. This is often the case when a historian or journalist seeks to publicize previously unpublished writings of a prominent public figure that reveal unflattering aspects of the person's history or personality. *See Holt*, 695 F. Supp. at 1523. In such circumstances, the plaintiff's invocation of copyright remedies to suppress an unauthorized publication of protected matter seeks to undermine, rather than to promote, the ultimate objective of copyright to advance the dissemination of knowledge. U.S. CONST. art. 1, § 8, cl. 8 (the "Progress of Science"). In such circumstances, the accessibility of the copy to the public might serve, rather than undermine, the justification for the copying. A second circumstance might lie where the importance of unfettered public access to what is provided by dissemination of the original is sufficiently great, as envisioned in *Time Inc.*, 293 F. Supp. at 146, the case concerning the unauthorized publication of copies of frames of the Zapruder film of the assassination of President Kennedy.

Considering the reasoning of that case, it is easy to imagine that *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985), might have come out the other way had the content of the protected text (and other facts) been somewhat different. If the protected text had revealed

There may well be other effective justifications. Like the rest of the fair use analysis, whether a justification is sufficient "calls for case-by-case analysis" and "is not to be simplified with bright-line rules." *Campbell*, 510 U.S. at 577.

We turn now to examine how the Supreme Court's teachings in the *Campbell* and *Warhol* cases bear on the district court's reasoning in our case in finding that the Defendant's unauthorized publication of Plaintiff's photograph was a fair use. We find two significant errors in the district court's reasoning. The first relates to the Supreme Court's explanations in *Campbell*, and again in *Warhol*, stressing the importance of a transformative purpose as justification for the copying – that the copying transmit a message that differs from the message communicated by the original. As explained below, the district court misunderstood the meaning of this test and erred in concluding that Defendant's

---

a corrupt bargain between President Richard Nixon and Vice President Gerald Ford that President Nixon would yield the presidency to the Vice President if he promised in return to pardon the President, and the Ford manuscript had been locked in concealment, rather than on its way to publication in a few days, it is easy to imagine that the Supreme Court might have concluded that, although public importance of prompt revelation does not ordinarily justify a finding of fair use, in some circumstances it might do so.

copying of Plaintiff's photograph transmitted any message other than the message of Plaintiff's photograph.

Second, the *Campbell* Court explained and the *Warhol* Court reemphasized the importance to fair use of a justification for the copying. The district court made no finding that could satisfy the second requirement, and we can think of none. No aspect of the statutory factors favors a finding of fair use.

As for whether Amilus's copying of the Plaintiff's woman and snakes image had a transformative purpose, the district court believed it did because, in the district court's view, it communicated the fact that there was a growing trend on the internet to publish pet photos —a message not communicated by the original image. This misunderstood the test for transformativeness. The test turns on whether *the copying of the original* communicates a message that differs from the message of the original – not whether the copier separately declares such a message. Amilus's republication of the snake image did not show that there was a growing trend to publish pet photos online. The only support in its publication for that proposition was Amilus's statement to that effect. Neither

*Campbell* nor *Warhol* (nor any other precedential opinion discussing transformativeness) stated or implied that a copying would be deemed transformative, favoring a finding of fair use, merely because the copier, separate from the act of copying, asserted a fact about the original not asserted by it. Copying that communicates a message not communicated by the original favors fair use because it "promote[s] the Progress of Science," U.S. CONST. art.1, § 8, cl. 8, by advancing knowledge. Notwithstanding what Defendant said about Plaintiff's image, its unauthorized copying and distribution of the image communicated no message other than what the original image communicated. It did nothing to further the goals of copyright. In Justice Story's words, it merely "supersede[d] the objects" of the original creation. *Folsom*, 9 F. Cas. at 348.

The second flaw in the district court's reasoning was its failure to heed *Campbell*'s insistence, later reiterated in *Warhol*, that there must be *justification* for copying, which, but for the finding of fair use, would likely infringe the exclusive

rights of the rights holder.[10] As reviewed above, justification is often found when the copying serves to critique, or otherwise comment on, the original, or its author, but can also be found in other circumstances, such as when the copying provides useful information about the original, or on other subjects, usually in circumstances where the copying does not make the expressive content of the original available to the public.

The only reason given by the district court to explain its conclusion that Defendant's republication of Plaintiff's copyright-protected photograph should be deemed a fair use was Defendant's statement that it perceived a growing trend on the internet to publish photos of people with pets. App'x at 80, 82. Such an observation, even assuming it to be true, does not justify unauthorized copying and distribution of copyright protected expression.

---

[10] We recognize that the Supreme Court had not yet decided the *Warhol* case when the district court made it decision, and that the district court might easily have believed, as other lower courts probably did, that *Campbell*'s insistence on the importance of a justification for copying applied only to claims of parody. Nonetheless, in reviewing the district court's decision, we are compelled to apply the law as the Supreme Court has subsequently explained it.

Little would remain of an author's copyright protection if others could secure the right to copy and distribute a work simply by asserting some fact about the copied work. Websites could freely copy and sell the new novels of others to their subscribers, undermining the author's exclusive rights, simply by declaring, "Our editors have observed a recent increase in new novels about young love in college settings. By joining our book club for only $20 per year, you will immediately get a link to the newest such novel, and every month thereafter a new novel in the most current trend." *See Warhol*, 598 U.S. at 529 (warning that "an overbroad concept of transformative use, one that includes any further purpose, or any different character, would narrow the copyright owner's exclusive right to create derivative works"). The district court pointed to nothing in Defendant's copying of Plaintiff's work that could furnish a justification for the Defendant's copying and redistribution of it. Considering the full range of reasons which courts have found to provide justifications, we see nothing in the information given by the complaint that could furnish such a justification. Defendant's copy did not communicate any criticism or

commentary on the original or its author, or indeed on any other subject (other than what was communicated by the original). What it did do was commercial exploitation of Plaintiff's work, selling it to its own customers for its own profit, competing in a market that the copyright law reserves exclusively to Plaintiff.

For all the reasons explained above, the first statutory fair use factor decidedly favors the Plaintiff. Not only did the Defendant copier flunk the tests of transformativeness of the copying and of need to show justification for the copying, but its copying was done for a commercial purpose, which, while not dispositive, is more helpful to Plaintiff than to Defendant.

Nor do the second, third, and fourth fair use factors specified by § 107 give any support to a finding of fair use. As for the second factor — the Photograph is an artistic work and the message it communicates is identically replicated by the message communicated by the Defendant's copy. Nothing about the second factor favors a finding of fair use. As for the third factor – "the amount and substantiality of the portion used [in the copying] in relation to the copyrighted work as a whole," 17 U.S.C. § 107(3) – Defendant took the entirety of Plaintiff's

work. While that fact alone is not fatal to a claim of fair use, Defendant cannot

escape liability on the ground that it took only a small part of the protected work.

As for the fourth factor – "the effect of the use on the market for or value of the

copyrighted work," 17 U.S.C. § 107(4) – Defendant's unauthorized distribution of

Plaintiff's Work diminished the value of Plaintiff's copyright by diminishing the

likelihood that others would seek and pay for a license to publish the

Photograph. So far as we are aware, no statutory factor and no argument favored

a finding of fair use. Nor do the four statutory factors in the aggregate support a

finding of fair use. Because no valid reason supported the district court's

conclusion that Defendant's copying of Plaintiff's work was a fair use, the court

had no reason to deny Plaintiff's motion for default judgment. We therefore

remand with instructions to grant the Plaintiff's motion for the entry of default

judgment.

### III. *Sua Sponte* **Consideration of a Defense Available to a Defaulting Defendant**

Judge Sullivan concurs in our judgment but argues that we should have

reached this judgment by a different path. He argues that the district court was

not entitled to raise *sua sponte* a substantive, non-jurisdictional affirmative defense on behalf of a defaulting defendant. We respectfully disagree.

As Judge Sullivan points out, the district court raised the fair use defense *sua sponte* and without an appearance by the defendant. We agree with Judge Sullivan that courts "must be cautious" about raising an affirmative defense *sua sponte* on behalf of defaulting defendants. *Arizona v. California*, 530 U.S. 392, 412–13 (noting a potential for "ero[sion of] the principle of party presentation so basic to our system of adjudication"), *supplemented*, 531 U.S. 1 (2000). Nonetheless, there is no categorical rule barring a court from considering an affirmative defense available to a defaulting defendant.

A district court's overly rigid refusal to consider an affirmative defense *sua sponte* can make a lawsuit an instrument of abuse. A defendant's default does not necessarily mean that the defendant has insouciantly snubbed the legal process. Corporations are barred from defending a suit other than through counsel. *See Grace v. Bank Leumi Tr. Co. of NY*, 443 F.3d 180, 192 (2d Cir. 2006). Hiring counsel costs money, often in substantial amount. At times, small corporations simply

cannot afford the expense of counsel needed to defend a suit. Default does not necessarily preclude the court's consideration of affirmative defenses available to the defendant, especially when they have obvious merit and their applicability is evident from the face of the complaint. Otherwise, plaintiffs could often easily inflict unjustified harms on small corporate enemies. Intimidation tactics would threaten to strip small creators of their content, and would silence the numerous small platforms that need the protection of the fair use doctrine.

For example, unscrupulous plaintiffs could bring stale claims barred by statutes of limitations, or bring back previously adjudicated claims, or lodge their suits in inconvenient jurisdictions where the defendant has no presence and cannot be compelled to respond consistent with due process. If the defendant defaulted for inability to afford counsel and an overly rigid rule barred the court from considering affirmative defenses, obviously valid defenses would be ignored, and such lawsuits could be fashioned as instruments of abuse rather than of justice.

Suits against press entities alleging copyright infringement can easily be fit into that mold. Consider a suit by a corrupt town mayor against a small, impecunious, local news entity. The suit seeks to suppress publication of an article that quoted from two of the mayor's writings: first, a speech by the mayor, vowing to secure passage of a popular legislative measure, and, second, a subsequent note from the mayor to a corrupt crony assuring that the speech was merely for show and that the mayor would surreptitiously use the tools of his office to ensure that the measure would never pass. The quotations in such circumstance would obviously qualify for the fair use defense. If the defendant cannot afford to hire counsel to raise the fair use defense, overly rigid application of the principle Judge Sullivan espouses would unjustly defeat the goals of copyright, rather than advance them.

Ability to consider affirmative defenses not raised by a defaulting defendant charged with copyright infringement can result in a fairer judgment in two different ways. First, when (unlike this case) it is evident on the face of the complaint that the defendant had a valid affirmative defense, the court can deny

41

default judgment for the plaintiff. Even in cases (again unlike this one) where the validity of the defense is a close question and the court can conclude that, notwithstanding liability, the defendant "was not aware and had no reason to believe that his or her acts constituted an infringement of copyright, the court in its discretion may reduce the award of statutory damages to a sum of not less than $200." 17 U.S.C. § 504(c)(2). The approach urged by Judge Sullivan prevents the court from using these devices to protect against abusive litigation.

The district court here believed that its consideration of the fair use defense would serve justice and advance the goals of copyright. As explained above, the court misunderstood the fair use defense, which in fact had no proper application to these facts. But we cannot fault the district court for considering a defense which it believed (albeit mistakenly) was valid and important. While district courts should indeed be cautious before *sua sponte* invoking affirmative defenses on behalf of defaulting defendants, they should also be cautious about not considering such defenses. A thoughtful approach to either course is desirable.

## CONCLUSION

The judgment of the district court is REVERSED. The case is REMANDED

with instructions to grant the Plaintiff's motion for default judgment.

RICHARD J. SULLIVAN, *Circuit Judge*, concurring:

While I agree with the majority that the district court erroneously dismissed Romanova's copyright infringement claims, I would reverse on a narrower ground, without wading into the merits of Amilus's unasserted fair use defense. In my view, the district court procedurally erred in *sua sponte* raising the affirmative defense of fair use on behalf of a non-appearing defendant, which is reason enough on these facts to reverse and remand the district court's order.

The law of this Circuit is clear that when a plaintiff adequately establishes a *prima facie* claim for copyright infringement, a defendant may invoke fair use as an affirmative defense. *See Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 49 (2d Cir. 2021), *aff'd*, 598 U.S. 508 (2023); *see also Castle Rock Ent., Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 141 (2d Cir. 1998). But precisely because fair use is an affirmative defense, "the party asserting [it] bears the burden of proof." *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015).

Here, taking the allegations in Romanova's complaint as true, I am quite certain that Romanova has established a *prima facie* claim for copyright infringement. Romanova's complaint plainly alleged facts indicating that she owned a protectable copyright interest in the photograph and that Amilus copied

her photograph without authorization. Had Amilus appeared below, it could have asserted fair use as an affirmative defense, *see Castle Rock Ent., Inc.*, 150 F.3d at 141; *Authors Guild*, 804 F.3d at 213; however, it chose not to do so despite having been served.

To be sure, even in a case in which a defendant has defaulted, "a district court need not agree that the alleged facts constitute a valid cause of action." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (internal quotation marks omitted). But the district court did not conclude that Romanova failed to plead a viable claim of copyright infringement. Instead, the district court *sua sponte* interposed the affirmative defense of fair use (largely untethered from any specific allegations in the complaint), and then faulted Romanova for not sufficiently rebutting this defense. This was error. *See Goldsmith*, 11 F.4th at 49; *see also Hardaway v. Hartford Pub. Works Dep't*, 879 F.3d 486, 491 (2d Cir. 2018) (reversing a district court's *sua sponte* dismissal of a complaint because the "burden of pleading and proving Title VII exhaustion lies with defendants and operates as an affirmative defense"); *Finkel v. Romanowicz*, 577 F.3d 79, 88 (2d Cir. 2009) (concluding that the district court "erred as a matter of law" when it "*sua sponte* raised an affirmative defense on behalf of [a non-appearing defendant] and

2

erroneously placed a burden on the [plaintiff]"). The Supreme Court itself has warned that "trial courts must be cautious" about raising affirmative defenses "*sua sponte*, thereby eroding the principle of party presentation so basic to our system of adjudication." *Arizona v. California*, 530 U.S. 392, 412–13 (2000); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1110 (D.C. Cir. 2019) ("In each of the cases in which the [Supreme] Court has sanctioned *sua sponte* action by a court to raise a forfeited affirmative defense, the Court has made clear that the circumstances of a case must squarely implicate the institutional interests of the judiciary for such action to be permissible."). In dismissing the complaint on the basis of fair use, the district court disregarded its obligation to "accept all of [Romanova's] factual allegations as true and draw all reasonable inferences in [her] favor," *Finkel*, 577 F.3d at 84, and instead required Romanova to disprove an affirmative defense that Amilus did not assert, *see Mickalis Pawn Shop, LLC*, 645 F.3d at 133 (recognizing that affirmative defenses may "be purposely waived or inadvertently forfeited"). It was not the district court's place to stand in the shoes of Amilus and interpose defenses that Amilus itself had forfeited through its non-appearance. And while Romanova will still have the burden of establishing what damages, if any, resulted

from Amilus's infringement, I remain convinced that it was improper for the district court to dismiss Romanova's complaint for failure to state a claim.

In defending – and perhaps even encouraging – *sua sponte* assertions of affirmative defenses by district courts in copyright cases, the majority cites no authority, relying instead on a series of hypotheticals featuring "unscrupulous plaintiffs," "corrupt" small-town mayors, and penniless defendants lacking the means to hire an attorney or mount a defense. Although none of these stock characters is present here, the majority nonetheless eschews a straightforward application of the Federal Rules of Civil Procedure – which would resolve this appeal in just a few short paragraphs – in favor of a lengthy exegesis on a meritless fair use defense that Amilus itself never asserted. In my view, the more efficient (and ultimately less costly) way to resolve disputes of this sort is the one requested by Romanova herself – namely, entry of a default judgment against the non-appearing defendant. I also note that the hypothetical abuses and potential harms identified by the majority are easily remedied by other provisions in the Federal Rules and by the inherent powers of courts, which are more than sufficient to address real-world misconduct on the part of unethical litigants.

For all these reasons, I would reverse the district court's judgment and remand with instructions to enter a default judgment against Amilus – for the simple reason that the district court erred as a matter of law when it "*sua sponte* raised an affirmative defense on behalf of [Amilus] and erroneously placed a burden on [Romanova]." *Finkel*, 577 F.3d at 88.